Judgment will be entered accordingly.

(C.D. 4102)

RED SEAL ELECTRIC CO., INC. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided October 22, 1970)

*Allerton deC. Tompkins* for the plaintiff.

*William D. Ruckelshaus,* Assistant Attorney General (*Harold L. Grossman,* trial attorney), for the defendant.

Before RAO, FORD, and LANDIS, Judges

LANDIS, Judge: This protest involves articles described as "Pantograph Collectors", imported from West Germany, and entered at Cleveland, Ohio, as parts for hoists, winches, and traveling cranes, dutiable at 10.5 per centum ad valorem under TSUS (Tariff Schedules of the United States) item 664.10.

Customs classified the invoiced pantograph collectors under TSUS item 685.90, dutiable at 17.5 per centum ad valorem, apparently as electrical apparatus for making connections to or in electrical circuits.[1]

Plaintiff claims that the pantograph collectors are parts for machinery described in TSUS item 664.10 and therefore dutiable at 10.5 per centum ad valorem. In an amendment to the protest, plaintiff alterna-

_____

[1] Copy of a Bureau of Customs letter dated February 17, 1967 to Allerton deC. Tompkins, Esq. establishing that classification in reply to a letter from Mr. S. J. Stryffeler, President, Red Seal Electric Co., plaintiff in this case, is attached to defendant's brief.

tively claims that the pantograph collectors are dutiable at 11.5 per centum ad valorem under TSUS 688.40, the so-called basket provision for electrical articles, and electrical parts of articles, not specifically provided for.[2]

TSUS items 685.90, 664.10, and 688.40 appear in schedule 6 of the tariff schedules in the following text:[3]

685.90    Electrical switches, relays, fuses, lightning arresters, plugs, receptacles, lamp sockets, terminals, terminal strips, junction boxes and other electrical apparatus for making or breaking electrical circuits, for the protection of electrical circuits, or for making connections to or in electrical circuits; switchboards (except telephone switchboards) and control panels; all the foregoing and parts thereof\_\_   17.5% ad val.

664.10    Elevators, hoists, winches, cranes, jacks, pulley tackle, belt conveyors, and other lifting, handling, loading, or unloading machinery, and conveyors, all the foregoing and parts thereof not provided for in item 664.05_____   10.5% ad val.

688.40    Electrical articles, and electrical parts of articles, not specially provided for_____   11.5% ad val.

The official papers are in evidence. A pantograph, illustrative and identical in principle and operation to those imported, but five times smaller and having a capacity of only one hundred amperes is also of record. (Exhibit 1.) The imported pantographs are current collectors with a capacity of eight hundred amperes and have two so-called shoes instead of one, as does the sample. We would describe exhibit 1 as an article with a metal base plate in which there are holes for attachment. Mounted on the base plate are metal pieces that give the pantograph its frame. The pieces are bolted together in a fashion that they collapse or flex like a knee joint under weighted pressure adjusted by two springs on each side of the frame. A so-called shoe, designed to slide on a rail is bolted to the top of the frame. The shoe appears to be made chiefly of brass and other material not identified of record, and has lugs on each side for connecting electrical wire or cable. On one side, the sample has a cable attached to the lug on the shoe and a lug on the metal base plate.

The testimony of Mr. S. J. Stryffeler, president and general manager of the plaintiff corporation, which we next summarize, completes the evidence adduced on trial.

---

[2] Tariff Classification Study, Schedule 6, page 308.
[3] TSUS items 685.90 and 688.40 are in part 5 of schedule 6. TSUS item 664.10 is in part 4 of schedule 6. Part 4 headnote (v) states that part 4 does not cover articles and parts of articles specifically provided for elsewhere in the schedules.

Mr. Stryffeler stated that he holds a B.S. Degree in engineering from the Case Institute of Technology. His education in electronics, however, appears to be limited to that received in study of radar and electrical equipment while in the United States Navy. His company, said Mr. Stryffeler, manufactures and distributes a line of electrical fittings, including the imported pantograph collectors, for heavy industrial purposes. Mr. Stryffeler testified that he was familiar with the function and uses of the imported pantographs and had observed their "application" in the heavy industrial sections of the United States.

Coming down to the function of the imported pantograph collectors, Mr. Stryffeler stated that they function "to complete an electrical circuit between a stationary conductor and a moving machine; and, also, to accommodate misalignment between the stationary conductor and the moving machines [such as overhead traveling cranes] that sway or are displaced." Stated differently he said that "[i]t completes the circuit and carries the current from the stationary rail to the wiring, or electrical system of the crane. He explained that overhead traveling cranes, either elevated or on the floor, operate on rails and are electrically powered by a motor which drives the wheels on the rail. The electrical power is conducted through the stationary rail and the pantograph collectors.

Pantograph collectors, Mr. Stryffeler stated, are also used on other types of conveying equipment such as monorails, gantry cranes, shipyard cranes and other moving equipment designed to operate at a speed not exceeding five miles per hour.

Attached to the imported pantographs is the cable as illustrated in exhibit 1. The cable, according to Mr. Stryffeler, completes the circuit between the stationary conductor rail and the moving machine. The so-called shoes on the top side of the imported pantographs are its contact to the conductor rail and the contact is kept constant by pressure from springs, so that the pantograph is always in contact with the conductor rail, of what we assume to be an overhead type. The metal base plate of the pantograph is fixed to the moving machine with hardware. Mr. Stryffeler stated that the pantograph collectors are necessary to overhead conveyors and cranes, "to complete the circuit and feed electricity to the moving machine, as the machine moves along its runway." He also testified that the pantographs do not control the movement, volume, or speed of anything, and that they cannot make or break an electrical circuit because there is no "provision" for making or breaking the circuit through pantograph current collectors. It is Mr. Stryffeler's opinion that pantographs do not "make connections to or in electrical circuits; they just complete the elec-

trical circuit, like any wire would." However, the witness when asked to explain this testimony stated that "[a] wire in the electrical circuit connects one point to another point, and conducts electricity between it; and this [pantograph] collector functions in the same way." The witness stated that devices other than the pantographs are used to safely make and break the electrical circuit which the pantograph completes. Mr. Stryffeler distinguished the imported pantograph collectors from the electrical switches, relays, fuses, and other articles described in the classifying TSUS item 685.90, by testifying that the articles described in item 685.90 all have a provision for making or breaking the circuit or making connection to or in the electrical circuit while the "pantograph collectors under protest complete the circuit, they are part of the circuit, an integral part of the circuit, and conduct the electricity from one point to another point."

Asked if he knew of any uses for the pantograph collectors other than on or with the articles that are specified in TSUS item 664.10, Mr. Stryffeler testified that he did not. The pantograph collectors, he said, are physically attached to the articles mentioned in TSUS item 664.10 and when so used perform an essential and necessary function. Mr. Stryffeler said he was familiar with pantograph collectors used on electrical traction equipment, and testified they were different from the imported pantograph collectors in that they "have the ability to make and break the circuit, in addition to conducting or completing the circuit between the wire and the moving machinery, just as these pantograph collectors under protest do." He explained that "pantograph collectors used on electrical traction equipment have a, either an electrical or a electrical and mechanical feature which allows them to be raised and lowered and, therefore, make contact or leave the conductor that they are being used against", whereas the imported pantographs are designed to be permanently in contact with the power rail and have "no mechanical feature within them to raise or lower the sliding contact from the rail." Mr. Stryffeler stated that he had no knowledge of the imported pantograph collectors ever being used with any of the articles mentioned in TSUS item 664.05.

TSUS item 685.90, under which customs classified the pantograph collectors, is a restatement of heading 85.19 in the "Nomenclature for the Classification of Goods in Customs Tariffs" (usually known as the "Brussels Nomenclature"). The Brussels Nomenclature is one of the systems which "exerted the greatest influence on the arrangement of the proposed revised [TSUS] schedules." (Tariff Classification Study, Submitting Report, 1960, at page 8.)

Mr. Stryffeler's testimony of how the pantograph collectors are used and function is markedly the same as the use and function of the class of articles the Brussels Nomenclature states is included in heading 85.19 as follows:

(III) APPARATUS FOR MAKING CONNECTIONS TO OR IN ELECTRICAL CIRCUITS

This apparatus is used to connect together the various parts of an electrical circuit. It includes:

(A) *Plugs and sockets* for connecting a movable lead into a fixed installation or apparatus, or for connecting together two movable leads. The plug may have one or more pins or side contacts which match corresponding holes or contacts in the socket. The rim or one of the pins may be used for earthing purposes.

The present heading [Apparatus for Making Connections to or in Electrical Circuits] also includes *sliding contacts* such as brushes for motors and current-collectors for electric traction vehicles, lifting appliances, etc. (overhead or third rail collectors, etc.) * * *. [Explanatory Notes to the Brussels Nomenclature, 1955, Volume III, page 961, emphasis quoted.]

Section XVI of the Brussels Nomenclature, which includes Brussels heading 85.19, explains the general content of the section with respect to the classification of parts as follows:

(II) PARTS

In general, *parts which are recognisable as specialised to or mainly for use with particular machines or apparatus* * * *, or with a group of machines or apparatus falling in the *same* heading, are classified under the same heading as those machines or apparatus * * *.

\*       \*       \*       \*       \*       \*       \*

The above rules do *not* apply to parts which *in themselves* constitute an article covered by a heading of this Section * * *; these are in all cases classified *in their own appropriate heading* even if specially designed to work as part of a larger machine.

This applies in particular to:

\*       \*       \*       \*       \*       \*       \*

(ii) Electrical apparatus for making and breaking or for protecting electrical circuits (switches, fuses, junction boxes, etc.) (heading 85.19). [Explanatory Notes to the Brussels Nomenclature, 1955, Volume III, page 766, emphasis quoted.]

The clear purport of the Brussels Nomenclature is to exclude from the general rule classifying parts, articles which, even though spe-

cially designed to work as parts of machinery, are in themselves covered by the heading "Apparatus for Making Connections to or in Electrical Circuits". Cf. *Herbert G. Schwarz, dba Ski Imports* v. *United States*, 57 CCPA 19, C.A.D. 971 (1969). The presumption that customs correctly classified the pantograph collectors under TSUS item 685.90, *The De Haan Company* v. *United States*, 55 CCPA 76, C.A.D. 936 (1968), in our opinion, is corroborated by the Brussels Nomenclature.

Mr. Stryffeler's testimony that the imported pantograph collectors complete an electrical circuit and do not make connections to or in electrical circuits apparently attempts to convey the opinion that there is a distinction between completing and connecting an electrical circuit without explaining a difference. That the witness himself is confused as to the facts is evident from his testimony which after denying that pantograph collectors make connections to or in electrical circuits, thereafter contradicts this testimony as appears from the following colloquy:

Q. Now, do these pantograph collectors here under protest, when used on the vehicles you have mentioned, such as the cranes, and the conveyors, do they require other instruments to make connections to or in the electrical circuitry?—A. No, they [the pantograph collectors] * * * just complete it—like an electrical wire will.

Q. Well, will you explain? What do you mean, like another wire would? What do you mean?—A. *A wire in the electrical circuit connects one point to another point, and conducts electricity between it; and this collector functions in the same way.* [Emphasis added.]

The testimony from plaintiff's only witness as to whether the pantograph collectors complete, or whether they connect, an electrical circuit is equivocal and unconvincing. And, assuming there is a distinction, no reason has been advanced why electrical apparatus completing an electrical circuit cannot, at the same time, be connected to or in the electrical circuit.

Plaintiff having failed to overcome the presumption of correctness attaching to the customs classification under TSUS item 685.90, the protest claims under TSUS item 664.10 and TSUS item 688.40 are overruled.

Judgment will be entered accordingly.